# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| P.R., a minor, and S.R., natural parent and guardian, | Case No. 1:17-cv-00521-CWD |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| SHOSHONE SCHOOL DISTRICT NO. 321; KELLY CHAPMAN, an individual, and ROBERT WAITE, an individual, | |
| Defendants. | |

## INTRODUCTION

Pending before the Court is Defendants' motion for summary judgment and related motion to strike. (Dkt. 22, 31.) This case involves allegations by Plaintiffs that Defendants' response to a sexual assault at school between two students, Plaintiff P.R. and L.C., was inadequate.[1] Plaintiffs P.R. and her mother, S.R., claim that Defendants' failure to investigate the incident and appropriately discipline L.C. resulted in the

---

[1] Because P.R. is a minor, and L.C. was a minor at the time, each will be referred to by his or her initials. (Dkt. 19.) Additionally, P.R.'s mother will be referred to by her initials, S.R., to protect P.R.'s identity, as the parties have been doing in their public filings.

deprivation of P.R.'s federally protected rights to an education at Shoshone Middle School and Shoshone High School. Defendants contend the District officials, Principal Kelly Chapman, and Superintendent and Title IX officer Robert Waite, responded appropriately upon discovering the incident between the two students.

The Court conducted a hearing on the pending motions on September 18, 2018, at which the parties appeared and presented their arguments. After carefully considering the record, the parties' briefing and oral argument, as well as relevant authorities, the Court will grant summary judgment to Defendants in part and deny it in part, as explained below.

## PROCEDURAL BACKGROUND

Plaintiffs' complaint sets forth nine causes of action. Counts One and Two allege violations of Title IX as to Defendant Shoshone School District; Counts Three and Four allege Section 1983 claims against all three Defendants under Title 42 of the United States Code; and Counts Five, Six, Seven, Eight and Nine allege claims under state law under various theories.

In response to the motion for summary judgment, Plaintiffs conceded Counts Three, Five, Six, Seven, Eight, and Nine in the Complaint by "withdrawing" them. (Dkt. 30 at 2, 23.)[2] Accordingly, the Court's analysis is confined to Counts One, Two, and Four.

---

[2] Plaintiffs confirmed their intent to withdraw these counts during the hearing. The Court construes Plaintiffs' withdrawal of these counts as a request for voluntary dismissal pursuant to Fed. Rule Civ. P. 41(a)(2), and will grant the same.

Plaintiffs disputed the majority of the facts set forth in Defendants' statement of undisputed facts. Because of the significant disparities in the parties' versions of the facts, and based upon review of the entire record, the Court has outlined below the facts and factual disputes material to the legal issues presented with Defendants' motion.

## FACTS[3]

P.R. attended the eighth grade at Shoshone Middle School during the 2016-2017 school year. That same year, L.C. was a junior attending Shoshone High School. The schools share the same campus, which is located at 61 E. Highway 24, in Shoshone, Idaho.[4] P.R. first met L.C. in December of 2016.[5] At that time, P.R. was 13, and L.C. was 16.

On the early afternoon of Tuesday, April 25, 2017, Kelly Chapman, the school principal,[6] entered the computer lab at Shoshone High School[7] and found P.R. and L.C.

---

[3] *See* Defendants' Statement of Undisputed Facts (Dkt. 22-1); Plaintiffs' Appendix Two, Analysis and Rebuttal to Defendants' Undisputed Facts (Dkt. 30-2). The undisputed facts are culled from the Plaintiffs' admissions to certain of Defendants' statement of undisputed facts and based also upon the representations made by the parties at the hearing. The Court has, however, reviewed the deposition testimony and corresponding documents in the record from Kelly Chapman, Robert Waite, L.C., P.R., and P.R.'s mother, S.R. The Court views all such evidence in the light most favorable to Plaintiffs.

[4] *See* http://shoshonesd.org/schools/shoshone-high-school

[5] It is not clear whether P.R. and L.C. met at school or were introduced outside of school.

[6] Chapman is the principal of both Shoshone Middle School and Shoshone High School. Ans. ¶ 5.

[7] The computer lab is located within the campus for Shoshone High School. Ans. ¶ 27.

together, watching Netflix.[8] She sent them both back to their respective classrooms. Later

that day, Chapman spoke with the school counselor, Ms. Schroeder, about walking in on

the two students. Chapman expressed that it was odd the two students were there

together, because one was in middle school and one was in high school, and they should

not have been together in that same location at that time. Chapman wanted to find out

what the two students had been doing, so she accessed the video tape from earlier in the

day. Upon review of the video tape, Chapman discovered the two students had engaged

in sexual activity in the computer lab before she walked in. Upon learning the two

students had engaged in sexual activity, Chapman contacted law enforcement.

Before viewing the video tape on April 25, 2017, Chapman did not know or

suspect that P.R. and L.C. had engaged in sexual activity. And, the record contains no

evidence that anyone else at Shoshone Middle and High School or Shoshone School

District was aware of their activities.

After classes on April 25, two local law enforcement officers arrived at the school

and met with Chapman to discuss how to proceed. The officers and Chapman decided to

interview the students the next day with their parents in attendance. On the morning of

Wednesday, April 26, 2017, P.R. was interviewed in Chapman's office with her mother,

---

[8] It is not clear from the record how much time elapsed before Chapman unlocked the door and entered the computer lab. The record reflects, however, that the two students were fully clothed at the time she walked in, and she did not know of the sexual activity until she viewed the video footage later that same day on April 25, 2017. Chapman Aff. ¶ 3. (Dkt. 22-3.)

S.R., present.[9] At various times during the interview, Chapman was present as was Sheriff Rene Rodriguez and Officer Green. P.R.'s father was present at the school for a portion of the morning.

P.R. remembers "getting asked what had happened in the computer lab and they had only, like, saw the video of, like the 25th and so when I said that we had had sex, Ms. Chapman was like, no, you guys didn't, like, and she just hadn't checked, like, the videos, like, from before." P.R. Depo. at 66-67.[10] At that point, it appears S.R., Chapman, and the officers reviewed the video footage from the computer lab taken during the day on Monday, April 24, 2017. S.R. Depo. at 25-27.

After P.R.'s interview concluded, P.R. was sent to the hospital with her mother and another law enforcement officer, where she received a physical examination. S.R. was informed that, because of P.R.'s age (13), she would be referred to CARES.[11]

Later on Wednesday, April 26, 2017, law enforcement officers interviewed L.C. with his parents in attendance.[12] Chapman testified she was careful to ensure that P.R. and L.C. did not have contact during that day. Chapman Aff. ¶ 8. (Dkt. 22-3.) Law

---

[9] The record does not reflect who interviewed P.R., or whether Chapman was present during the entire interview.

[10] There were two video tapes---one from April 24 and the second from April 25. P.R.'s deposition is in the record at Docket 31-3.

[11] P.R. described CARES as a place for women who have been assaulted. P.R. Depo. at 69. No other information was provided in the record regarding CARES.

[12] Chapman did not interview L.C. Chapman Depo. at 60. The record does not reflect who interviewed L.C. or whether Chapman was present for the interview. Likely, law enforcement interviewed him.

enforcement officers informed Chapman that day that L.C.'s conduct would be charged as lewd and lascivious conduct. Ans. ¶ 31.

On Thursday, April 27, 2017, L.C. was arrested at school, and was escorted off the school premises because of the incident with P.R. Afterwards, L.C. was suspended from school for nine school days. Because the Shoshone schools are on a Monday through Thursday schedule, the suspension lasted from Monday, May 1, through Monday, May 15, 2017. This was the maximum suspension Chapman believed she was able to impose under state law as the school's Principal. Chapman Depo. at 53, 56.[13] Chapman did not recommend further discipline for L.C. after imposing the nine-day suspension, and Robert Waite, the Superintendent and Title IX officer, agreed with her recommendation. Chapman Depo. at 58-60. L.C. returned to Shoshone High School on May 16, 2017.

Chapman testified that she reviewed the school handbook prior to determining L.C.'s disciplinary consequences. Chapman Depo. at 59-60. Chapman interpreted L.C.'s behavior as falling within the school handbook's disciplinary policy prohibiting public displays of affection and inappropriate behavior. Chapman characterized what she saw on the video tapes, which she testified depicted oral intercourse and anal intercourse, as signs of an "intimate relationship."[14] Chapman Depo. at 60-61. Chapman was aware that L.C. was charged with five counts of lewd and lascivious conduct, although it is not

---

[13] Chapman's deposition transcript is in the record at Docket 32-4.

[14] There is no evidence in the record regarding whether the tapes contained audio.

entirely clear from the record when Chapman became aware of the nature of the criminal charges filed against L.C. Chapman Depo. at 55.[15]

The Complaint characterizes what occurred between L.C. and P.R. as rape, which characterization the District denies. P.R. testified in her deposition that, on April 24, 2017, L.C. "pressured" her to have sex with him that day in the computer lab—he was "grabbing my arm," and she felt like she could not leave the room. P.R. Depo. at 50-52. P.R. described L.C. as "aggressive that day." P.R. Depo. at 54.

P.R. testified that, the next day, April 25, L.C. contacted her via Snapchat, telling her that he wanted her to go to the computer lab. P.R. met L.C. in the computer lab, which was empty. According to P.R., L.C. made sure that the door was locked. L.C. "kept…asking to have sex again and I kept saying no, 'cause what had happened the day before…he asked for oral and he said that if I gave him oral, then he would let me leave." P.R. Depo. at 56. She complied, although she described L.C. as using physical force by holding her head and she did not know if she could have left the computer lab. P.R. Depo. at 57.

P.R. testified that, when she met with CARES personnel on April 26, she told them she was raped, assaulted, and that L.C. physically did something to her that she felt was threatening that she "did not say yes to." P.R. Depo. at 70-71. It is not clear from the record whether Chapman or Waite knew about P.R.'s allegations to CARES personnel, or

---

[15] Chapman's handwritten notes bear a date at the top of the page of April 26, 2017, and farther down the page there is the following note: "L[C] – Judge today; 5 counts." (Dkt. 30-7 at 8.) In the Answer, Defendants admitted Chapman was told by law enforcement on April 26 that L.C.'s conduct would be charged as lewd and lascivious conduct.

whether P.R. had described the incidents at school similarly to law enforcement during their interview of her on April 26.

Sometime shortly after the interviews with the students,[16] Robert Waite met with Chapman, and the two discussed three topics. First, the two discussed the need to conduct an investigation separate from the police investigation. Waite Depo. at 20.[17] However, no written report was prepared, and the only formal document produced was a letter regarding L.C.'s suspension that was sent to L.C.'s parents. Other than Chapman's handwritten notes taken at various times,[18] school officials did not prepare a written report concerning the events of April 24 and 25, 2017, or their aftermath, and the Court found no evidence of such a report in the record. (*see* Dkt. 30-7 at 13, and Dkt. 30-7 at 7, referencing Bates No. SHOS 0296.)

Second, Waite and Chapman discussed how to handle L.C.'s return to school after his suspension concluded. Waite testified that the school needed information from P.R.'s family, because "[w]e didn't know at this point the nature of the relationship" between P.R. and L.C. Waite Depo. at 29. Accordingly, depending upon the nature of the relationship, he and Chapman discussed that L.C. could be placed in the alternative

---

[16] It is not clear when Chapman and Waite met, although it appears they met after the April 26, 2017 interviews with the students, but before Chapman met with P.R. and S.R. later in May.

[17] Robert Waite's deposition transcript is in the record at Docket 30-7.

[18] Chapman kept what appears to be a spiral notebook containing sparse notes about various conversations and other topics. The notes do not contain a descriptive narrative, and are not readily decipherable by the Court. They do, however, bear dates at the top of some of the pages—there are two pages dated "4/26/17," one page dated "4/27/17," one page dated "5/9/17," and several undated pages with additional notes.

school; enroll in online school; or the school could make sure that he and P.R. did not pass in the hall. However, the school wanted to know whether P.R. felt it was the best thing for her to return to Shoshone Middle School or stay away. Waite testified that he and Chapman decided Chapman would meet with P.R.'s family to determine the best way to proceed. Waite Depo. at 27. However, Waite and Chapman did not discuss notifying P.R.'s family that the school was depending upon the family's decision whether and when to send P.R. back to school before the school determined a plan for L.C. going forward. *Id.*

And last, Waite testified that he and Chapman discussed three options for P.R. to finish the remainder of the 2016-17 school year – one would be to work from home and get homework assignments from her teachers; the second would be to take her grades as they were, and be done for the school year; and the third option would be resuming attendance at the middle school, at which point a discussion would occur concerning how to keep L.C. and P.R. separated. Waite Depo. at 34. Waite testified that he and Chapman determined that they would come up with a plan based upon P.R.'s wishes. Waite Depo. at 41. In the meantime, Chapman emailed P.R.'s teachers on April 27th, requesting that they send assignments to P.R. for her to complete at home. Chapman Depo. at 12.[19]

Thereafter, Chapman met twice with P.R. and her mother, S.R. During the first meeting, held on or about May 1, 2017, Chapman testified that she explained P.R. could return to school, she could continue doing what she was doing by obtaining homework

---

[19] The email, sent to P.R.'s teachers, states that P.R. "will be out of school for the next two weeks. Please send work to the office." (Dkt. 30-7 at 9.)

assignments, or she could be done for the year—meaning P.R. could receive the grades she had earned and complete the eighth grade without returning to school or completing any more homework assignments. Chapman Depo. at 49. Chapman's handwritten notes reflect also that Chapman knew P.R. had a counseling meeting on May 16th, and that Chapman informed S.R. that L.C. might return, but his placement would depend upon whether P.R. returned to school. Chapman Depo. at 46-47. (Dkt. 30-7 at 13, referencing SHOS 0296 at Dkt. 30-7 at 7.)[20]

S.R. recalls the first meeting differently. S.R. testified she informed Chapman that CARES had advised her that P.R. should not return to school until after May 9. S.R. Depo. at 21, 33.[21] Chapman's handwritten notes reflect she was aware of this

---

[20] Chapman's handwritten notes are undated, and state as follows:



[21] S.R.'s deposition transcript is in the record at Docket 32-2.

recommendation.[22] Thereafter, S.R. recalls Chapman informed her of only two options for P.R. – that she could "drop off school or do home school. And I ask if she expels [P.R.] out of school and she say, 'No, but it's better.'" S.R. Depo. at 32.

The second meeting with Chapman, S.R., and P.R. occurred also during the first part of May, with Sheriff Rodriguez present to translate. S.R. Depo. at 33-36. At the second meeting, an agreement was made that the school would provide homework assignments for P.R. to complete at home. S.R. Depo. at 22. On May 16, 2017, S.R. accompanied P.R. to her next counseling appointment at CARES, at which time a plan was made for P.R.'s recovery. S.R. Depo. at 34.[23]

P.R. recalls the meeting, or meetings,[24] with Chapman a bit differently. P.R. recalls she met with Chapman, her mother, and Sheriff Rodriguez approximately two weeks after the April 26, 2017 interview at school. P.R. Depo. at 73-75. P.R. remembers asking about when she was going to return to school, at which time Chapman gave her "two options of either dropping off the school year or just going home schooled" for the

---

[22] Chapman's undated note states:



[23] It is not clear what significance the May 16, 2017 CARES counseling appointment had, but it was mentioned by S.R., and reference was made to it in Chapman's handwritten notes.

[24] Although S.R. and Chapman testified P.R. was present for both meetings with Chapman, P.R. testified only about the second meeting, when Sheriff Rodriguez was present.

remainder of the school year. P.R. Depo. at 75-76. Her understanding of home school was that she would still be in the school system, and she could try to improve her grades, so "we had agreed that I would be getting homework, like, every week." P.R. Depo. at 77-78. However, P.R. testified she received homework only "two times." *Id.* at 78-79. S.R. testified she stopped by the school every week, and also had her son, who attended Shoshone High School, stop at the school's office for P.R.'s homework. Neither she nor her son were ever given anything to take home to P.R. S.R. Depo. at 22-23.

Chapman testified she requested P.R.'s teachers to send homework assignments to the school office "as necessary," although she does not know whether the teachers did so; she could not identify how many lessons were sent home to P.R. between April 27 and May 23; and, she did not oversee or monitor the sending of any lessons home. Chapman Depo. at 13-16. When a teacher asked Chapman on May 23, 2017, whether she was to continue sending homework for P.R. to the office, Chapman responded via email: "Yes, or you could tell her she can be done." (Dkt. 30-7.)

During her deposition, P.R. was asked whether she remembered Chapman telling her to let her know if she wanted to return to school so she could make arrangements to take care of L.C. if she did return. P.R. denied that Chapman ever "mentioned her coming back to school. [Chapman] only gave me those two options." P.R. Depo. at 78-79. P.R. did not return to school after the 26th of April, because "going back to school wasn't an option," and Chapman told her "that it just wasn't a good idea and that's basically it." P.R. Depo. at 82-83.

During the one meeting in May of 2017 with Chapman, P.R. recalls Chapman mentioning a "safety plan, because they were planning on, like, letting [L.C.] come back to school," but that no one fully explained to her what that meant. P.R. Depo. at 85. She understood only that L.C. would return to school, and if she were to attend school and run into him, that "I guess I would be safe, but they never explained it, not that I remember." P.R. Depo. at 85-86. S.R. recalls also that, during the meeting on May 1, 2017, Chapman mentioned a safety plan, but S.R. did not know what it was, and Chapman did not explain to her what it meant. S.R. Depo. at 21, 33.

Chapman testified that L.C.'s placement could not be determined until the school heard from P.R.'s family what P.R.'s plan was regarding returning to school. Chapman indicated that S.R. did not communicate with her regarding their family's plans to have P.R. return to school, but neither did Chapman independently follow up with S.R. to inquire about their wishes. Chapman testified there was no written plan prepared for P.R. if she chose to attend Shoshone Middle or High School after April 26th.

Upon L.C.'s return to school after his suspension on May 16, 2017, the school put in place a safety plan for him. The plan allowed L.C. to attend his required classes in the

morning, with supervision during all times on school grounds.[25] If P.R. returned to

school, "there would be further restrictions." Chapman Depo. at 52. It is not clear from

the record who would be supervising L.C. There was nothing in writing regarding this

"safety plan" other than Chapman's handwritten notes, and Chapman testified the plan

had nothing to do with P.R. Chapman testified that, unless and until P.R. returned to the

school, there was no need for a safety plan regarding P.R. Chapman was waiting for

P.R.'s mother to contact her regarding P.R.'s intent to return to school before she

developed any further plans to keep P.R. and L.C. separate while attending classes for the

remainder of the school year.

Chapman testified that, in reviewing P.R.'s final report card at the end of the

spring semester, P.R. passed all her classes except for writing, in which P.R. received an

F. Her fourth quarter grades consisted of five F's, two D's, one A, and one B, while her

---

[25] Chapman's handwritten notes dated "5/11/17" state:



Another undated note reflects as follows:

final grades from her second semester consisted of four D's, one F, one B, an A+ in PE, and two C's. (Dkt. 23 at 55.) P.R. had less than a 90% attendance rate during her second semester of eighth grade. She was entitled to continue to the next grade level, despite her low attendance and receiving an F for one of her final second semester grades.

At some point in August of 2017, Chapman recalls learning that P.R. would be homeschooled.[26] Thereafter, school records indicate that, on September 11, 2017, Shoshone High School sent P.R.'s records to Gooding High School. Chapman made no follow up inquiry. Chapman knew that L.C. was planning to return to Shoshone High School for his senior year. She testified that there was no reason P.R. could not have enrolled, and that no one told P.R. or S.R. that P.R. could not attend Shoshone High School. Chapman testified that, had P.R. returned to the high school, she would have set up a meeting[27] and implemented a safety plan, but because she was informed P.R. would be homeschooled, that meeting never needed to occur.

S.R. did not speak with anyone at Shoshone High School concerning whether P.R. could return to school for ninth grade, as she had decided she did not want P.R. returning to Shoshone "[b]ecause [L.C.] is in school and how they treat my daughter, no." S.R. Depo. at 31. P.R. testified that she did not enroll in the ninth grade at Shoshone High School because she "didn't want to be in school with [L.C.]," who she knew would be

---

[26] Chapman believes S.R. informed the school sometime at the end of August that P.R. was going to be homeschooled. It is not clear who informed Chapman or how she learned this information other than by reviewing the student enrollment system. Chapman Depo. at 63.

[27] It is not clear who Chapman intended to meet with.

there. P.R. Depo. at 84-85. P.R. testified that she did not have any contact with school district officials about going back to Shoshone High School for ninth grade "because of what happened. I just didn't feel safe." P.R. Depo. at 86. In September of 2017, P.R. enrolled at Gooding High School.

S.R. did reach out by email to Shoshone Middle or High School in August of 2017, asking to speak with Waite. Chapman Depo. at 97. Waite did not recall who S.R. was, and upon receiving the email, responded to Chapman, "is this the [L.C.] situation girl," to which Chapman responded, "yes I believe so." (Dkt. 30-7 at 19-20.) Chapman allegedly learned after the fact that Waite had met with S.R. and had informed S.R. that "she could enroll [P.R.] right now if she wanted to." *Id.* Chapman learned of the meeting, and its substance, third hand, from the school secretaries, and there is no written note or record of the conversation. Waite's deposition testimony in the record does not specifically reference a meeting with S.R. in August of 2017. S.R. recalled the meeting lasted for five minutes, and that they discussed only why Chapman would not talk to S.R. S.R. Depo. at 23.

As for L.C.'s return to high school in the fall of 2017, Chapman testified that she recalled a meeting in August with L.C. when she informed him, verbally, regarding the terms and conditions of his supervision at school while attending classes. But, she did not distribute anything in writing to his teachers, and she does not recall whether she informed L.C.'s teachers that he could not be in an unsupervised class.[28]

---

[28] *See* note 25, supra.

L.C., who played soccer and basketball for Shoshone High School, was informed he could not play high school sports his senior year by Tim Chapman, the school athletic director, and Kelly Chapman. L.C. Depo. at 11-13.[29] L.C. was told also that, depending upon the outcome of the criminal charges against him, he could be subject to further discipline, including expulsion. L.C. graduated from Shoshone High School in the Spring of 2018. L.C. Depo. at 10.[30] The criminal case against L.C. was not concluded until after L.C. was no longer a student at the high school.

## DISCUSSION

### 1. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, in pertinent part, that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

For summary judgment purposes, an issue must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation; an issue is "genuine" if it must be established by "sufficient evidence supporting the claimed factual dispute ... to

---

[29] Portions of L.C.'s deposition are in the record at Docket 48-1. Chapman's notebook contains an entry dated September 28, 2017, that states: LC – "went to game sat on the bench. Talk to. No more practice or games." (Dkt. 31-5 at 99.)

[30] L.C. testified he graduated in the Spring of 2018. Defendants, however, indicated L.C. completed his education at Shoshone High School in December of 2017. (Dkt. 22-1 at 4.)

require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)); *see also British Motor. Car Distrib. v. San Francisco Auto. Indus. Welfare Fund*, 883 F.2d 371, 374 (9th Cir. 1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In considering a motion for summary judgment, a court does not make findings of fact or determine the credibility of witnesses. *See Anderson*, 477 U.S. at 255. Rather, it must draw all inferences and view all evidence in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).

## 2. Evidentiary Objections

### A. *S.R. and P.R. Affidavits*

In response to Defendants' motion for summary judgment, Plaintiffs submitted affidavits of S.R. and P.R., explaining that the "relevant facts are best presented by affidavits rather than repetitively stating in this brief references to pages and lines in depositions." Pls.' Responsive Brief at 2. (Dkt. 30-2.) Plaintiffs' intent was for the affidavits to be read together with the deposition testimony. Thereafter, Defendants filed a motion to strike certain paragraphs in each of the affidavits, arguing they contain conclusory statements, argument, and inadmissible hearsay, and that the testimony contradicts that given during their depositions. Also, Defendants submitted the complete

deposition transcripts of P.R., S.R., and Chapman. (Aff. of Reid, Dkt. 31-2.) Plaintiffs did not file a response to Defendants' motion to strike.

The Court has reviewed the affidavits and the deposition testimony of P.R., S.R., and Chapman, and finds it unnecessary to address Defendants' objections at this time. The Court agrees that the affidavits appear to be more detailed than some of the deposition testimony and provides some argument. However, for purposes of deciding the motion for summary judgment, the Court has reviewed and relied upon the full deposition transcripts. Defendants' objections are preserved, as necessary, for purposes of trial.

### B. *Chapman's Testimony*

Plaintiffs raised an evidentiary objection in their motion to supplement the factual record,[31] asserting that Defendant Chapman was untruthful in her answers to interrogatories and to questions asked during her deposition about any special relationship between L.C.'s family and Shoshone school staff. During her deposition, Chapman denied that L.C.'s father was a full or part time coach of the soccer team in 2016. Thereafter, the parties deposed L.C., who testified that his father volunteered on the sidelines as a coach for the soccer team, and was granted special access to do so, for the 2016 and 2017 state cup soccer tournament. The high school soccer coach permitted L.C.'s father to volunteer at the 2016 state cup tournament held in Twin Falls. L.C. Depo.

---

[31] Plaintiffs moved to supplement the record with excerpts of L.C.'s deposition, which was taken after Defendants filed the motion for summary judgment. (Dkt. 44.) The Court granted the motion. (Dkt. 45.)

at 14. L.C.'s father was given a tag to allow him to be on the sidelines for the tournament, and he was given one again for the state cup tournament in 2017, the year L.C. did not play. L.C. Depo. at 87-88. L.C. testified also that Chapman's husband, Tim Chapman, was the athletic director at the school. L.C. Depo. at 13. The Chapmans informed L.C. that he was ineligible to play high school sports his senior year.

Plaintiffs argue that the status of L.C.'s father as a coach for the school soccer team during the state cup soccer tournament is relevant, because it provides a motive for Defendants to treat L.C. differently, and more favorably, than P.R. Defendants dispute that there is any contradiction between L.C.'s and Chapman's testimonies, and further contend that L.C.'s father's status as a volunteer coach or parent is not evidence that P.R. was treated differently because she was female. Defendants contend also that L.C.'s testimony is inadmissible hearsay and is not based upon firsthand knowledge.

First, the Court notes that, upon summary judgment, it is not for the Court to determine the credibility of the witnesses. The distinction between coach and volunteer is therefore left to the jury.

Second, the Court finds it may consider L.C.'s deposition testimony. Upon summary judgment, deposition testimony is admissible, provided the testimony can be presented in a form admissible in evidence. Fed. Rule Civ. P. 56(c)(1)(A), (c)(2). L.C. testified in his deposition concerning his own personal observations and knowledge. He was a member of the school soccer team during the fall of 2016. He testified that his father traveled with the team to the state cup tournament and assisted as a volunteer

coach during the games. Such testimony is derived from L.C.'s personal observations and is admissible upon summary judgment in its current form.

The Court notes that Defendants do not dispute L.C.'s account with contradictory testimony. Further, L.C.'s personal observations of his father on the sidelines during the soccer tournament, and the potential inferences to be drawn from these facts, are relevant here regarding the Court's analysis of Plaintiffs' Title IX claim, as explained below.

**3.      Title IX Claims – Counts 1 and 2 as to Defendant Shoshone School District[32]**

Plaintiffs bring two claims against the District under Title IX of the Education Amendments of 1972. Title IX provides, with certain exceptions not at issue here, that:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 638 (1999). The United States Supreme Court established four requirements for the imposition of school district liability under Title IX for peer harassment. First, the school must exercise "substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. Second, the sexual harassment must be "so severe, pervasive, and objectively offensive, that it can be said to deprive the victims of access to the educational opportunities or

---

[32] The parties do not differentiate between Counts One and Two, and the two counts are considered together in Defendants' memorandum. In the Complaint, Count One alleges the District was deliberately indifferent to the alleged sexual harassment, while Count Two alleges the District retaliated against P.R. by withholding protections conferred by Title IX, by not allowing her to return to school.

benefits provided by the school." *Id*. at 650. Third, the school must have had "actual knowledge" of the harassment. *Id.* And fourth, the school district is liable only if "its deliberate indifference subjects its students to harassment. That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 644-45. (internal quotation marks and citations omitted).

The Supreme Court has explained that "deliberate indifference" occurs "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id*. at 648. Courts should, however, "refrain from second-guessing the disciplinary decisions made by school administrators." *Id.*

Here, Defendants contend Plaintiffs' Title IX claims are subject to dismissal because P.R. was not deprived of educational opportunities, and their response to P.R.'s claim of harassment was not deliberately indifferent. Each argument will be addressed in turn.

### A.    *Exclusion from Educational Opportunities*

The Court must consider whether the "harassment…effectively bar[red] the victim's access to an educational opportunity or benefit." *Id.* at 633. To satisfy this element, a student need establish only that the sexual harassment was severe, pervasive, and objectively offensive to the point that it undermined and detracted from the plaintiff's educational experience and that she was denied equal access to an institution's resources and opportunities. *Id.* at 651. An evidentiary link between the harassment and access to educational or related services, balanced with the persistence and severity of harassment,

can work to establish a disadvantaged environment for the victim. *Id.* at 652; *Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1027 (E.D. Cal. 2009).

The court in *Davis* explained that the most obvious example of peer sexual harassment capable of triggering a damage claim involves the overt, physical deprivation of access to school resources. *Davis*, 526 U.S. at 650. However, it is not necessary to show physical exclusion to demonstrate deprivation of an educational opportunity by the actions of another student. *Id.* at 651. "Rather, a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Id.*

The court in *Roe* gave the following examples of a negative impact on access: "dropping grades, being diagnosed with behavioral and/or anxiety disorders, becoming homebound or hospitalized due to harassment, physical violence, or sexual assault." *Roe ex rel. Callahan*, 678 F. Supp. 2d at 1028 (internal citations omitted).

The District's argument here is twofold. First, the District argues that P.R. was not denied access to educational opportunities, because P.R. could have returned to attend classes at the middle school any time after April 26, 2017. The District argues Plaintiffs voluntarily chose to keep P.R. out of school and elected to receive her lessons to

complete at home. She thereafter graduated from the eighth grade and enrolled at Gooding High School of her own volition.[33]

Plaintiffs dispute this factual scenario, pointing to P.R.'s deflating grades during the second semester of the school year during the alleged harassment by L.C.; the fact she did not receive lesson plans or assistance at home from the school after the school officials learned of the harassment/sexual activities; and that she was effectively barred from access to educational opportunities at Shoshone Middle School from the time of the incident to the end of the school year. Plaintiffs argue that the move to Gooding was not voluntary and was predicated instead on their perception that P.R. was blamed for the incidents of harassment and sexual assault by L.C. Plaintiffs assert the evidence supports an inference that P.R. and her mother received no information from the District as to how the school would implement a strategy to ensure P.R. would not experience further harassment upon her return to classes, either from L.C. or her classmates. They note that L.C. was a popular soccer player; he was still enrolled in and attending high school; and P.R. was fearful of retaliation if she returned to school. Thus, Plaintiffs contend P.R. was effectively denied equal access to the institution's resources and opportunities, and that her transfer to Gooding High School presented a hardship.

Examining the facts in the light most favorable to Plaintiffs, they present evidence of a sexual assault by a much older male student on a thirteen-year-old female student.

---

[33] A review of Chapman's deposition testimony indicates only that she was aware P.R. had transferred to Gooding High School. S.R. testified that P.R.'s grades at Gooding High School were "[n]ot that bad. They're good," and that she was proud of P.R. "because she's still doing good in school." S.R. Depo. at 38.

Chapman chose to characterize what she saw on the video tapes as an intimate relationship, supporting an inference that, in some sense, she viewed the sexual activity as consensual. However, P.R.'s testimony and L.C.'s arrest supports a contrary inference. P.R. described L.C. as aggressive, pressuring, and forceful, and she testified that he performed sexual acts against her will. L.C. was charged with five counts of lewd and lascivious conduct. Contrasted with Chapman's testimony, a reasonable juror could infer Chapman did not conduct a thorough investigation to understand all the facts and circumstances. This inference is supported by Chapman's sparse notes in the aftermath of the police interviews with P.R. and L.C., and the lack of any independent investigation and report prepared by the District.

While Chapman and others may testify that school officials never told P.R. and her mother that P.R. should stay out of school, P.R. and S.R. claim they were never informed how the District would ensure P.R. would be safe from L.C. (and the possible taunting by others) if P.R. chose to return to the classrooms. P.R. has presented facts that, if established, she feared not only running into L.C. while attending Shoshone Middle and High School, but also repercussions from her classmates given L.C.'s status on the soccer team and his inability to play soccer his senior year as a result of the sexual assaults coming to the attention of the District.

In *Doe*, the court found a genuine issue of material fact on the issue of a plaintiff's access to her school's educational opportunities based upon the mere fact that the plaintiff and her attacker attended school together. *Doe ex rel. Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 233 (D. Conn. 2009). There, the record showed that Jesse,

who had sexually assaulted the plaintiff, was permitted to continue attending school with the plaintiff for three years after the assault, leaving constant potential for interactions between the two students. *Id.* The court found that, even though the defendant argued otherwise, "a reasonable jury could conclude that Jesse's mere presence at the high school was harassing because it exposed [Mary Doe] to the possibility of an encounter with him." *Doe*, 630 F. Supp. 2d at 233 (quoting *Kelly v. Yale Univ.*, No. 3:01–CV–1591, 2003 WL 1563424, at *3 (D. Conn. March 26, 2003)).

In this case, P.R. claims the sexual activity that occurred at school was not consensual on her part. There is also the fact of P.R.'s young age, the significant age difference between the two students, the nature of the sexual activity that occurred as described by P.R., and L.C.'s arrest and criminal prosecution. This was not simply two students engaging in a public display of affection in the hallways. Further, P.R. contends she was provided no details about a purported safety plan that Chapman referenced during one or both meetings Chapman held in May with P.R. and her mother, and P.R. testified she would not have felt safe if she returned to Shoshone Middle or High School knowing that L.C. also would have been in attendance. Plaintiffs have presented sufficient evidence that, if believed by a jury, could support a finding of a denial of educational opportunities.

Defendants argue that P.R.'s choice to complete homework assignments and to enroll at Gooding High School in the fall effectively absolves the District of any liability and establishes that P.R. was not deprived of access to the educational opportunities or benefits provided by Shoshone Middle School and Shoshone High School. However,

P.R. testified that she felt she had no choice other than to accept the option of receiving lessons at home for the remainder of her eighth-grade year, and to enroll in Gooding High School, because she was unaware of the safety plan's details.

Plaintiffs presented evidence that P.R. received at best only two lessons from the middle school teachers over the span of several weeks, despite asking repeatedly for more. When Chapman was asked by a teacher if work should be sent home to P.R., Chapman relayed that the teacher could inform P.R. she was "done." P.R.'s grades reflect that she struggled her last quarter at school, bringing down her already low grades. Chapman testified that she had no knowledge regarding whether work was sent home to P.R.; Chapman did not follow up with P.R.'s teachers to ensure P.R. was receiving communications from them to facilitate P.R.'s success at home; and Chapman conducted no follow up with Plaintiffs to inquire regarding their intent to register P.R. at Shoshone High School in the fall. Although Defendants assert they did not need to follow up because P.R. was already enrolled automatically in the high school, an inference can be drawn from the lack of communication, especially regarding the terms of a safety plan, that P.R. was effectively denied the opportunity to return to school unless she risked exposure to harassment and retaliation.

Under the facts here, Plaintiffs have presented enough evidence that, if believed by a jury, could support a finding that the District denied P.R. of educational opportunities or benefits at Shoshone Middle and High School.

## B. *Deliberate Indifference*

In *Davis*, the United States Supreme Court explained that "deliberate indifference" occurs "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. While Title IX requires that the school try to remedy known peer harassment in a manner that is not clearly unreasonable under the known circumstances, the Supreme Court made it clear that school districts are not required to "purge" their schools of "actionable peer harassment" or engage in "particular disciplinary action." *Id.* at 648-49. The Supreme Court rejected the premise that "nothing short of expulsion of every student accused of misconduct involving sexual overtones would protect school systems from liability or damages." *Id.* at 648. Accordingly, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.*

As further guidance, this Court and others have had occasion to examine the deliberate indifference standard in other contexts. Deliberate indifference requires "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *D.A. v. Meridian Joint Sch. Dist. No. 2*, 289 F.R.D. 614, 622–23 (D. Idaho 2013) (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). The public entity's failure to act must be a result of more than mere negligence; rather, it must involve a measure of deliberateness. *Duvall*, 260 F.3d at 1139. But "deliberate indifference" is also "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "Deliberate indifference will often be a fact-laden

question," for which bright lines are ill-suited. *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 457 n. 12 (5th Cir. 1994); *see also Doe A. v. Green*, 298 F. Supp. 2d 1025, 1036 n. 4 (D. Nev. 2004) (stating that no bright line rule in Ninth Circuit cases defines "deliberate indifference," and finding the same from a review outside the circuit). Liability is imposed upon a federal funding recipient's deliberate indifference, because "the deliberate indifference constitute[s] intentional discrimination on the basis of sex." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005).

Plaintiffs do not argue that the District took no action, but rather assert that the District's response was inadequate considering the circumstances. That L.C. was not expelled is not dispositive of this issue, as a victim of peer harassment does not have the right to any particular remedial demand. *Davis*, 526 U.S. at 648. However, Plaintiffs have produced evidence from which a reasonable trier of fact could conclude that the District's response was inadequate, amounting to deliberate indifference.

It is undisputed that, upon becoming aware of the incident at school on April 25, Chapman acted immediately, involved law enforcement, and suspended L.C. for nine days. However, there is no evidence the District conducted an independent investigation to inform its decision-making, despite Waite's suggestion, as the Title IX officer, to Chapman to do so. A jury considering the facts could find that the District's investigation, or lack thereof, into the nature of the sexual relationship between the students was unreasonable.

There is no evidence in the record as to how Chapman concluded L.C. and P.R. were engaged in an intimate relationship, which description connotes consent, other than

by watching the video tapes. Yet, P.R. testified she was pressured to perform sexual acts against her will at school behind a locked door. Her young age also belies Chapman's conclusion. *See Davis*, 526 U.S. at 651 (noting the ages of the harasser and the victim are important facts in determining whether gender-oriented conduct rises to the level of actionable harassment). Further, Chapman was aware L.C. was charged criminally for his conduct. Nonetheless, there are no school generated reports, notes, or letters providing a record of events. Chapman's sparse and cryptic handwritten notes together with the formal letter of suspension to L.C.'s parents constitute the only evidence in the record documenting the events. Under such facts, a jury could find the District's inquiry into the facts and circumstances was wholly deficient, which in turn misguided their response.

The District's response consisted of a vague "safety plan" to keep L.C. at school, which could be construed as an unreasonable response. A trier of fact could conclude that, because Chapman believed the sexual activity was consensual, she treated L.C. more favorably than P.R. by facilitating his educational opportunities while not facilitating P.R.'s return to school. After L.C.'s suspension, the District allowed L.C. to continue to attend school, with an ill-outlined safety plan, which was apparently only for him. Chapman testified that the safety plan had nothing to do with P.R. and instead centered around supervision of L.C. It is unclear why Chapman concluded L.C. required supervision if P.R. was not attending school, unless there was some concern about potentially predatory behavior. Under these facts, a jury could conclude the District's response was deliberately indifferent.

The District simply waited to hear from P.R.'s family regarding their wishes concerning P.R.'s schooling at the middle school and high school without taking any proactive steps to engage in a dialogue with P.R. and her family. Plaintiffs contend that the District's failure in that regard left P.R. vulnerable and confused, and essentially placed her in a position that was untenable for a thirteen-year-old girl. Plaintiffs' impression was that P.R. was being punished by being kept out of school and by not being given the lessons necessary for her to complete schoolwork. P.R. and S.R. both testified that option three—that of returning to school for the remainder of the 2016-17 school year—was not communicated to either of them. Further, there is no written documentation Chapman discussed that option with P.R. and S.R. And, P.R. and S.R. allegedly were unaware of the details of any safety plan to protect P.R.

Additionally, there is no evidence in the record of a written communication regarding the terms of a safety plan pertaining to P.R. or L.C. to Shoshone Middle or High School teachers. The record before the Court includes evidence that P.R. and her mother had no information from the District as to how the school would put in place a strategy to ensure P.R. would not experience further harassment upon her return to school, either from L.C. or her classmates, and that P.R. was fearful of retaliation if she returned to school. Under these facts, a jury could find that the District's response constituted deliberate indifference.[34]

---

[34] The Court likens the District's response to an employer who proposes that the victim of sexual harassment be moved to a different department. However, victims of sexual harassment "should not have to work in a less desirable location as a result of the employer's remedial plan…reasonable conduct involves taking action against the harasser. Thus, changing plaintiff's class schedule was not a step

While Defendants argue otherwise, the Court notes that a jury typically determines whether an institution acted with deliberate indifference. *Roe ex rel. Callahan*, 678 F. Supp. 2d at 1038. Plaintiffs have produced sufficient evidence from which a trier of fact could conclude that the District was deliberately indifferent to peer harassment under the circumstances here. Accordingly, Defendants' motion for summary judgment will be denied as to Counts One and Two under Title IX.

### 4. Section 1983 Claim – Count 4

Plaintiffs allege Defendants' failure to take adequate steps to remedy the peer sexual harassment rose to the level of intentional discrimination based on P.R.'s sex. Specifically, Plaintiffs allege that Chapman and Waite treated L.C. more favorably than P.R. by facilitating his return to school and not facilitating her return to school. Plaintiffs contend Chapman and Waite are not shielded by qualified immunity, because the right to be free from intentional gender discrimination by a state actor is clearly established under Title IX. As for their *Monell* claim against the District, Plaintiffs allege the District failed to train its supervisors to appropriately respond to instances of peer sexual assault, in violation of what Plaintiffs claim are the applicable Shoshone School District policies. (Dkt. 30-2 at 13.)

Defendants argue that there is no evidence that a similarly situated group was treated more favorably than P.R. Therefore, Defendants argue the Court cannot find a constitutional violation based upon violation of the Equal Protection clause. If a

---

reasonably calculated to end the peer sexual harassment and a reasonable official would not have believed it to be." *Nicole M. v. Martinez Unified School Dist.*, 964 F.Supp. 1369, 1386 (N.D. Cal. 1997).

constitutional violation did occur, Chapman and Waite argue they are entitled to qualified immunity. Regarding the *Monell* claim against the District, Defendants assert Plaintiffs have not established either a constitutional violation or identified a Shoshone School District official policy or custom that could have caused the deprivation of a constitutional right.

## A.    *Section 1983 Claim Against Chapman and Waite*

42 U.S.C. § 1983 provides a remedy to individuals whose federal constitutional rights have been violated under the color of state law. *Burke v. Cty. of Alameda*, 586 F.3d 725, 731 (9th Cir. 2009). To state a claim under 42 U.S.C. § 1983, a plaintiff must allege four elements: "(1) a violation of rights protected by the Constitution, or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir.1991). Section 1983 is "'not itself a source of substantive rights' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 143 n. 3 (1979)).

Chapman and Waite have asserted the defense of qualified immunity, which analysis entails three steps. First, the court must determine whether, taken in the light most favorable to the plaintiff, the facts alleged show a violation of the plaintiff's statutory or constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a violation has been alleged, the court next determines whether the right infringed was clearly established at the time of the alleged violation. Finally, the court assesses whether it would be clear to a reasonable person in the defendant's position that her conduct was

unlawful in the situation she confronted, for even if the defendant violated clearly established law, immunity is nonetheless available if she made a reasonable mistake with regard to what the law requires. *Id* at 202, 205; *see also Frederick v. Morse*, 439 F.3d 1114, 1123 (9th Cir. 2006) (characterizing this final inquiry as a discrete third step in qualified immunity analysis). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Accordingly, the Court will address whether Plaintiffs' complaint alleges a violation of rights under the Fourteenth Amendment or under Title IX.

### i. *Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. This "is essentially a direction that all similarly situated persons should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "To establish a § 1983 equal protection violation, the plaintiffs must show that the defendants, acting under color of state law, discriminated against [P.R.] as [a] member[ ] of an identifiable class and that the discrimination was intentional" or resulted from deliberate indifference. *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003). Discriminatory intent "implies that the decision maker...selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite

of' its adverse effects upon an identifiable group." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979). Deliberate indifference may be found if a school official or administrator responds to known discrimination or harassment in a manner that is clearly unreasonable. *See Flores*, 324 F.3d at 1135.

In support of their equal protection claim, Plaintiffs cite evidence used to support their Title IX claim and assert disparate treatment is established by Chapman's decision to allow L.C. to return to school after a nine-day suspension, while effectively preventing P.R.'s return to school. Put differently, Plaintiffs assert only that Defendants knowingly or with deliberate indifference treated P.R. differently than L.C. While the Court finds there are disputed facts material to finding deliberate indifference under Title IX, what is missing to support an Equal Protection claim are facts establishing Waite and Chapman treated other students with similar claims of harassment or sexual assault differently than they treated P.R. At this stage in the proceedings, Plaintiffs must present sufficient evidence to show discriminatory treatment—*i.e.*, evidence that Defendants treated P.R. differently from similarly situated individuals. *Freeman v. City of Santa Ana*, 68 F3d 1180, 1187 (9th Cir. 1995); *Attorney General v. Irish People, Inc.*, 684 F.2d 928, 946 (D.C. Cir. 1982) ("Discrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances.").

Other courts that have examined equal protection claims asserted in conjunction with Title IX claims require a showing of disparate treatment of the individual victim of harassment compared to other similarly situated students. *See Flores*, 324 F.3d at 1135 (record contained evidence that the plaintiffs' complaints of harassment based on their

actual or perceived sexual orientation were treated differently from other types of
harassment); *Nabozny v. Podlesny*, 92 F.3d. 446, 454 (7th Cir. 1996) (record suggested
that the plaintiff was treated differently from other students based upon evidence the
school administrators enforced harassment policies when presented with complaints by
female students, but failed to enforce them with regard to a male homosexual plaintiff's
complaints of similar harassment); *In re Doe v. Gladstone School Dist.*, No. 3:10-cv-
1172-JE, 2012 WL 2049173 *11 (D. Or. June 6, 2012) (finding that, absent evidence on
summary judgment of the defendant's response to any other alleged harassment, the
plaintiff's equal protection claim failed); *Jensen v. Reeves*, 45 F.Supp.2d 1265, 1278 (D.
Utah 1999) (holding student's equal protection claim failed in the absence of evidence
that he was disciplined in a manner differently than other similarly situated students).

The Court found no evidence in the record of either Chapman's or Waite's
responses to alleged harassment by other Shoshone Middle or High School students. To
support an equal protection claim, Plaintiffs must provide some evidence that other
students similarly situated to P.R. received more favorable treatment by the individual
Defendants. Here, P.R. has not provided evidence that could establish her complaint of
harassment was treated differently from complaints of harassment by other students,
based upon an impermissible classification. Consequently, P.R. has not established a
triable issue of fact as to her equal protection claims against Chapman and Waite
individually. *See Annamaria M. v. Napa Valley Unified School Dist.*, No. C 03-0101
VRW, 2006 WL 1525733, at *9 (N.D. Cal. May 30, 2006) (finding plaintiff did not
establish an equal protection claim of student who alleged only she was a member of a

protected class; defendant was a member of a different class; and defendants acted unreasonably.) Therefore, the Court need not reach the issue of qualified immunity.

The Court will grant summary judgment to Defendants on Plaintiffs' Equal Protection claims against Chapman and Waite.[35]

### ii. *Gender Discrimination*

Plaintiffs also plausibly advance a theory that P.R.'s Section 1983 claim alleges Chapman and Waite individually deprived P.R. of her right to be free from gender discrimination in violation of Title IX.

The Court notes that the Ninth Circuit has expressly declined to address whether school officials and employees can be sued under Section 1983 for a violation of Title IX. *See Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447, 1449 (9th Cir. 1995); *see also Oona R-S ex rel Kate S v. McCaffrey*, 143 F.3d 473, 475 (9th Cir. 1998).[36] Courts in other districts, however, have concluded that school officials may be sued in their individual capacities under Section 1983 for violations of rights protected by Title IX. *See Oona R-S ex rel Kate S. v. Santa Rosa City Schools*, 890 F.Supp. 1452, 1459-62 (N.D. Cal.1995); *Nicole M. By & Through Jacqueline M. v. Martinez Unified Sch. Dist.*, 964 F. Supp.

---

[35] Although there is insufficient evidence presently before the Court to raise a genuine issue of material fact that P.R. was treated differently than other students similarly situated to her with regard to enforcement of school policies related to sexual harassment, the Court may conclude otherwise after evidence is presented at the time of trial. In this regard, the Court then would consider the deliberate indifference and qualified immunity arguments as well.

[36] In *Oona*, the Ninth Circuit expressly declined to consider whether an individual could be sued under Section 1983 for violations of Title IX, or whether a suit against the school district itself was the exclusive remedy available for such violations. 143 F.3d at 475.

1369, 1379-81 (N.D. Cal. 1997); *Annamaria M v. Napa Valley Unified Sch. Dist.*, No. C
03-0101 VRW, 2006 WL 1525733, at *7 (N.D. Cal. May 30, 2006).

In the only line of cases the Court located that addressed the issue, the Northern
District of California, in *Annamaria M v. Napa Valley Unified Sch. Dist.*, held that an
allegation of deliberate indifference on the part of the school principal sufficient to state a
Title IX claim against the school district applied equally to the Section 1983 claim
against the principal individually.[37] The court further found that "the duty to take
reasonable steps to remedy a known hostile environment created by a peer [was] clearly
established" in the Ninth Circuit no later than 1998. 2006 WL 1525733, at *8 (citing
*Oona R-S*, 143 F.3d at 477 (holding "that the defendants [were] not entitled to immunity
for their failure to take steps to remedy the hostile environment created by the male
students in [plaintiff]'s class.")); *see also Nicole M*, 964 F.Supp. at 1383 ("Particularly in
the context of sexual harassment, [a school principal]'s failure to act is significant
because it may constitute evidence of her intent to discriminate on the basis of sex."); *cf.*
*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) (stating in the Title IX context
that "deliberate indifference to sexual harassment of a student by another student squarely
constitutes discrimination on the basis of sex.").

Defendants did not advance any argument for dismissal of this claim in their brief
in support of their motion for summary judgment, and Plaintiffs similarly failed to

---

[37] *Annamaria M* came before the court on a motion to dismiss. The court concluded the
allegations in the complaint stated a claim under Section 1983 based upon violation of Title IX. 2006 WL
1525733 at *7-8.

address the issue. Accordingly, to the extent Plaintiffs advance a claim under Section

1983 based upon a violation of Title IX, the claim survives summary judgment.

**B.      *Section 1983 Claim Against the District***

For Plaintiffs to prevail on their Section 1983 claim against the District, they must

establish that the execution of an official policy or unofficial custom caused the alleged

constitutional violation. *Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S.

658, 694 (1978). Under *Monell*, the requisite elements of a § 1983 claim against a

municipality or private entity performing a state function are the following: (1) the

plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy

or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's

constitutional right; and (4) the policy or custom was the moving force behind the

constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir.

2001).

The policy or custom "may not be proved through reference to a single

unconstitutional incident unless proof of the incident includes proof that it was caused by

an existing unconstitutional policy." *Rogan v. City of Los Angeles*, 668 F. Supp. 1384,

1395 (C.D. Cal. 1987) (internal quotation marks and alteration omitted). An unwritten

policy or custom must be so "persistent and widespread" that it constitutes a "permanent

and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 167-168 (1970)). "Liability for improper custom may not be predicated on

isolated or sporadic incidents; it must be founded upon practices of sufficient duration,

frequency and consistency that the conduct has become a traditional method of carrying

out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Further, a municipality or private entity performing a state function "may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled in part on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016) (en banc).

Plaintiffs contend Chapman and Waite failed to comply with Title IX regulations and District policies related to discipline for instances of sexual harassment. However, because Plaintiffs' evidence fails to establish an equal protection violation, the first element for establishing liability against the District—deprivation of a constitutional right—is not met. Even if Plaintiffs later establish either a violation of the Equal Protection clause or establish individual liability under Section 1983 for a violation of Title IX, the Court notes Plaintiffs did not present evidence of an express policy or custom of gender discrimination in the handling of peer sexual harassment, nor did the Court find evidence in the record before it of the District's failure to train its employees to appropriately respond to allegations of peer sexual harassment.[38]

---

[38] Plaintiffs provided a copy of the "Lincoln County School District" policies in their Appendix, indicating that they applied to the Shoshone School District. (Dkt. 30-1 at 18, and 30-2 at 13.) Defendants did not contest the applicability or admissibility of the policy excerpts provided. (Dkt. 32.) According to the District's website, Shoshone Middle School and High School are located within Lincoln County, Idaho, but appear to be part of the Shoshone Joint School District. *See* http://www.shoshonesd.org/.

The Court will therefore grant Defendants' motion with regard to Plaintiffs' claims under Section 1983 against the District.

## CONCLUSION

Based upon thorough consideration of the record and relevant legal authorities, the Court concludes that a reasonable jury could find that the District acted in a deliberately indifferent manner with respect to its response to the incidents at school on April 24 and 25, 2017, such that P.R. was effectively denied access to educational opportunities or benefits, in violation of Title IX. However, Plaintiffs did not introduce sufficient facts to support a claim against Chapman and Waite individually for violation of the Equal Protection clause of the Fourteenth Amendment under 42 U.S.C. § 1983. To the extent Plaintiffs advance a theory under Section 1983 based upon the alleged violation of Title IX, the Section 1983 claims against Chapman and Waite in their individual capacities survive summary judgment. Plaintiffs' *Monell* claim against the District does not survive, because Plaintiffs failed to establish that a specific policy or custom caused the alleged statutory or constitutional violation.

# ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)    Defendants' Motion for Summary Judgment (Dkt. 22) is **GRANTED IN PART AND DENIED IN PART.** Summary judgment is granted, in part, on Count Four with respect to the Equal Protection claim and the *Monell* claim, and denied on Counts One and Two.

2)    Counts Three, Five, Six, Seven, Eight, and Nine are **DISMISSED** without prejudice pursuant to Fed. Rule Civ. P. 41(a)(2).

3)    Defendants' Motion to Strike (Dkt. 31) is deemed **MOOT**.

4)    The Court will conduct a telephonic scheduling conference with the parties for setting a trial date. A separate notice of hearing is forthcoming.

DATED: December 21, 2018

Honorable Candy W. Dale
United States Magistrate Judge