E. Lee Schlender, ISBN 1171
SCHLENDER LAW OFFICES 2700
Holly Lynn Drive
Mountain Home, ID 83647
T:(208) 587-1999
    F:(208) 587-3535
    E: leeschlender@gmail.com


Attorney for Plaintiff


## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO


| | |
|---|---|
| P.R. a minor and S.R., her mother,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>SHOSHONE SCHOOL DISTRICT NO. 312.<br><br>　　　　　　　Defendant. | Case No.  1-17-CV-521-CWD<br><br>**PLAINTIFFS S.R'S. TRIAL BRIEF** |


Plaintiff P.R., a minor, by her natural parent and guardian S.R. and her counsel E. Lee Schlender hereby submits this Trial Brief pursuant to Local Rule 16.3. Since this Brief is being filed simultaneously with other pretrial submissions by the parties including witness and exhibit lists, S.R. is unable to include objections to Defendant's witnesses, exhibits, etc., as required by the Local Rule 16.3 (b). Thus if appropriate, S.R. will file a supplement to this Trial Brief within seven days of Defendant's filing.

## INTRODUCTION

This civil rights case is scheduled for jury trial to begin on April 15, 2019 at 9:30 a.m. The jury will decide the following issue: Whether Shoshone School District was deliberately indifferent to the hostile environment experienced by P.R. that denied her the right to access the educational opportunities and benefits offered all students by the district.

P.R.'s civil rights claim is brought pursuant to Title IX of the Education Amendments of 1972. Title IX provides that: "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

## PROCEDURAL BACKGROUND

Plaintiffs' original complaint, filed on December 27, 2017, set forth nine causes of action. Counts One and Two allege violations of Title IX as to Defendant Shoshone School District; Counts Three and Four allege Section 1983 claims against all three Defendants under Title 42 of the United States Code; and Counts Five, Six, Seven, Eight and Nine allege claims under state law under various theories.

In response to the motion for summary judgment, Plaintiffs conceded Counts Three, Five, Six, Seven, Eight, and Nine in the Complaint by "withdrawing" them. (Dkt. 30 at 2, 23.)[2] Accordingly, the Court's analysis is confined to Counts One, Two, and Four.

In a decision issued December 21, 2018, this court ordered that Defendants' Motion for Summary Judgment was granted in part and denied in part. Summary judgment was granted, in part, on Count Four with respect to the Equal Protection claim and the *Monell* claim, and denied on Counts One and Two, the alleged violations of Title IX. Counts Three,

Five, Six, Seven, Eight, and Nine were dismissed without prejudice pursuant to Fed. Rule Civ. P. 41(a)(2).

## TRIAL HOUSE KEEPING MATTERS

*Trial Estimate.* Plaintiff anticipates being able to present her case in two or three (3) trial days after the jury is empaneled.

*Relief Sought.* P.R. seeks compensatory damages. Plaintiff will also seek reasonable attorney's fees and costs.

*Witnesses.* Plaintiff's witness list is being provided to Defendants on April 1, 2019, in accordance with the Court's Trial Order.

*Exhibits.* Plaintiff's exhibit list is being filed on or before April 1. Videotape evidence will be provided to the court to be considered as sealed. Clips from the video are identified in Plaintiff's exhibit list. There is video from the school for April 24 and 25 2017 and from a CARES interview.

*Further discovery or motions.* Plaintiff filed motions in limine.

*Stipulations.* The parties stipulated to dismiss the individual plaintiff S.R. and the defendant parties Chapman and Waite. There is a stipulation as to certain joint exhibits.

*Settlement negotiations.* The parties have not successfully settled the case.

*Attorneys' Fees.* As set forth above, should Plaintiff prevail on her claim, she intends to move the Court for an award of reasonable attorneys fees and costs pursuant to 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1988 and/or Rule 54.

*Miscellaneous.* Plaintiff requests that witnesses be sequestered during trial until released by the Court from further testimony. The defendant has agreed to have available their employees including Kelly Chapman, Robert Waite, Tim Chapman and Kea Dowd. Defendant has subpoenaed the minor Luis and the sheriff Rodriquez and has agreed to share that subpoena so

as to allow the Plaintiff to call these individuals as part of their case in chief without serving yet another subpoena.

*Order of Witnesses :*  Plaintiff will coordinate the order of witnesses , especially those under subpoena and the district employees, with the Defendant and advise the court according to Rule.

### A BRIEF SUMMARY OF THE CASE HISTORY SUPPORTING P.R.'s TITLE IX CLAIM

The detailed recitation of facts with reference to documents and depositions as contained in the Court's Order Denying Motion for Summary Judgment is far more complete than what is stated here. Only a scant overview is provided here to set the stage for application of case law prior to trial.

P.R. attended the eighth grade at Shoshone Middle School during the 2016-2017 school year. That same year, L.C. was a junior attending Shoshone High School. The schools share the same campus in Shoshone, Idaho. P.R. first met L.C. in December of 2016. At that time, P.R. was 13, and L.C. was 16.

On the early afternoon of Tuesday, April 25, 2017, Kelly Chapman, the school principal, entered the computer lab at Shoshone High School and found P.R. and L.C. together, watching Netflix. (as they represented). She sent them both back to their respective classrooms. Later that day, Chapman spoke with the school counselor, Ms. Schroeder, about walking in on the two students. Chapman expressed it was odd the two students were there because one was in middle school and one was in high school, and they should not have been together in that location.

Chapman wanted to check on what the two students had been doing, so she accessed the videotape from the lab surveillance camera from earlier in the day. Upon review of the tape Chapman viewed the two students engaging in sexual activity before she walked in. Upon learning of the sexual activity Chapman contacted law enforcement.

Before viewing the videotape on April 25, 2017 Chapman did not know or suspect that P.R. and L.C. had engaged in sexual activity. The record contains no evidence that anyone else in the Shoshone School District was aware of his or her activities. No claims are being made against the district on the basis that they should have known about and prevented this from occurring.

After classes on April 25 two Lincoln County officers arrived at the school and met with Chapman to discuss how to proceed. The officers and Chapman decided to interview the students the next day with their parents in attendance. On the morning of Wednesday April 26, 2017, P.R. was interviewed in Chapman's office with her mother S.R. present.

P.R. remembers "getting asked what had happened in the computer lab and they had only like, saw the video of, like the 25th and so when I said that we had had sex, Ms. Chapman was like no, you guys didn't, like, and she just hadn't checked like, the videos like, from before." At that point, it appears S.R., Chapman, and the officers reviewed the video footage from the computer lab taken the prior day on Monday, April 24, 2017.

After P.R.'s interview concluded P.R. was sent to the hospital with her mother and another law enforcement officer where she received a physical examination. S.R. was informed that P.R. would be referred to CARES, a regional organization that assists those sexually assaulted.

Later on Wednesday April 26, 2017, law enforcement officers interviewed L.C. with his parents in attendance. The officers informed Chapman that L.C.'s conduct would be charged as lewd and lascivious conduct.

On Thursday April 27, 2017 L.C. was arrested at school and escorted off the school premises. L.C. was then suspended from school for nine school days. ( In controversy as to how many days or time he actually did not go to the school).

Chapman testified in deposition that she reviewed the school handbook prior to determining L.C.'s disciplinary consequences. Chapman interpreted L.C.'s behavior as falling within the school handbook's disciplinary policy prohibiting public displays of affection and inappropriate sexual behavior. Because the Shoshone schools are on a Monday through Thursday schedule, the suspension lasted from Monday, May 1, through Monday, May 15, 2017. This was the maximum suspension Chapman believed she was able to impose under state law.

Chapman did not recommend further discipline for L.C. after imposing the nine-day suspension and Robert Waite the Superintendent and Title IX officer, agreed with her recommendation. L.C. returned for half days on May 16, 2017.

Waite and Chapman maintained in deposition that they discussed how to handle L.C.'s return to school after his suspension concluded. In deposition Waite testified that the school needed information from P.R.'s family, because "[w]e didn't know at this point the nature of the relationship" between P.R. and L.C. Both Chapman and Waite also stated in deposition that they had questions related to whether P.R. had consented to engage in these sexual acts. No contemporaneous notes exist evidencing that concern.

Sometime shortly after the interviews with the students Waite reportedly met with Chapman and the two reportedly discussed the situation. Waite and Chapman maintained in their depositions that they discussed the need to conduct an investigation separate from the police investigation. However, no further investigation ensued and no written investigation report was prepared.

The only independently drafted document was a letter regarding L.C.'s suspension that was sent to L.C.'s parents. Other than Chapman's handwritten notes taken at various times which as to time and date are not documented, school officials did not prepare a written report concerning the events of April 24 and 25, 2017 or their planned actions to prevent further harassment, prevent retaliation, remedy any harm to P.R., or address aspects of the school climate that may create a hostile environment for P.R. upon her return to school. This was significant since the male was a star athlete; his father a coach and recrimination could be anticipated.

In deposition Waite testified that he and Chapman decided Chapman would meet with P.R.'s family to determine the best way to proceed. However, Waite and Chapman did not discuss a purported claim that they relied upon P.R.'s family to tell them the family's decision whether and when to send P.R. back to school although they had made a plan for L.C. to come back. Nor is there written documentation of the contingency planning for P.R.s return as they claimed to have discussed.

In deposition Waite testified that he and Chapman discussed three options for P.R. to finish the remainder of the 2016-17 school year. One option would be to work from home and get homework assignments from her teachers; the second would be to take her grades as they were and be done for the school year and the third option would be resuming attendance at the

middle school, at which point a discussion would occur concerning how to keep L.C. and P.R. separated. There is no written evidence collaborating these discussions.

Chapman met S.R. on or about May 1, 2017. Chapman testified in deposition that she explained that P.R. could return to school, she could continue doing what she was doing by obtaining homework assignments, or she could be done for the year ; meaning she could receive the grades she had earned and complete the eight grade without returning to school or completing more homework.

S.R. recalls the first meeting differently. She states that CARES told her to keep P.R. out of school until a May 9 meeting following the examinations by CARES and that this was the arrangement decided upon. However, she will testify that she was told only of two options--obtain homework assignments or be done for the year

At the second meeting in the first week of May Sheriff Rodriquez was present at S.R.'s request to translate and help her because English is S.R's second language and she was extremely upset that P.R. was not going to be able to return to school. P.R. was also present. P. Both S.R. and P.R. will confirm they were told that P.R. had two options—physically leaving the school and receiving her assignments at home or simply accepting grades then existing; that returning to school was never offered. Both S.R. and P.R recall vague discussion of a safety plan, which Chapman later in deposition stated was not for her at all but other students when L.V. returned to school. P.R. received homework only "two times." S.R. or her son Miguel stopped by the school each Monday to obtain homework for P.R Perhaps one partial lesson was handed to them; noting further was given to either to take home for P.R.

Chapman testified in deposition that she requested P.R.'s teachers to send homework assignments to the school office "as necessary," although she never checked to see if that

happened. Chapman could not identify how many lessons were sent home to P.R. between April 27 and May 23. Chapman did not oversee or monitor the sending of any lessons. Further when one teacher asked Chapman on May 23, 2017 via email whether she was to continue sending homework for P.R. to the office, Chapman responded via email: "Yes, or you could tell her she can be done."

Chapman testified that L.C.'s return could not be determined until there was communication from P.R.'s family regarding returning to school. Chapman claimed no Rodriquez family member told her the family's plans to have P.R. return to school. Chapman admitted that she made no attempts to contact the family; there was no "plan" prepared for P.R. if she chose to attend school after April 26th neither for the remainder of that year nor for the fall semester of 2017.

In deposition, Chapman testified that upon L.C.'s return to school after his suspension on May 16, 2017, the school put in place a plan for him. The "plan" allowed L.C. to attend required classes in the morning with supervision at all times on school grounds and that if P.R. returned, there would be further restrictions.

There is no written documentation of any such "safety plan" except Chapman's cryptic handwritten notes. Nothing was sent to L.C.'s parents or school staff regarding any plan, or identification of who was responsible for supervision. Finally, Chapman testified that this safety plan had nothing to do with P.R.'s attendance at school because it was presumed that P.R. was not returning to school.

Under state law and district policy an absence of more than nine days would normally disallow a student from being considered to have completed a grade level and move to the next grade.

Under Idaho law, there are provisions for students who are referred to as "homebound students." These are students who are still enrolled in school but for reasons such as medical are not able to attend school. To ensure that these students are well supported and able to keep up with their studies, the school assigns a teacher to regularly meet with the homebound student to ensure that they are progressing. No such services were offered to P.R.

P.R. did not attend school from April 26, 2017 until the end of the school year. Further, no homebound schooling approach with a visiting teacher was considered to ensure that P.R. was receiving assignments from her teachers; or receiving instruction and that her educational progress was monitored.

For the fourth quarter P.R,'s grades consisted of five F's, two D's, one A, and one B. Her final grades from her second semester consisted of four D's, one F, one B, an A+ in PE, and two C's. P.R. was promoted to the next grade level, despite her low attendance and failing grades. Despite these low grades and the predictable concerns for her success in the next school year, no tutoring was provided to P.R. during the summer. Chapman promoted her as per her personal discretion; it had nothing to do with completing school classes or achieving passing grades.

Chapman and Waite knew that L.C. was returning to school for his senior year. L.C., who played soccer and basketball for Shoshone High School, was later informed by Tim Chapman, the school athletic director, husband of Chapman that he could not play high school sports his senior year. That summer multiple efforts were made by L.C.'s attorney and others to allow L.C. to play soccer. L.C's father was a volunteer soccer coach for the team. In deposition, Chapman (principal) denied that L.C.'s father was ever a paid, part time or

volunteer coach. Her testimony was confirmed by denials of such knowledge in interrogatories and requests for admissions.

The high potential for vicious retaliation against P.R. by L.C.'s teammates and other students at the high school, due to the removal of L.C. from the team should have been readily apparent to these school administrators, especially as one was married to the athletic director. L.C.'s removal from the team placed the success of the team at risk. This also placed the ability of L.C. to receive a scholarship at risk.

There was no consideration of the high potential for retaliation against P.R. by L.C.'s teammates and classmates.

Despite the obvious potential for retaliation and the requirement under Title IX for the school to take steps reasonably calculated to prevent retaliation, no action was taken by either Chapman or Waite to address this serious potential for additional harm to P.R. from L.C.'s teammates or other students.

When school staff returned from the summer break on repeated occasions S.R. personally went to the school to talk with Chapman and get ready for P.R. to enroll that fall. She will testify that Chapman made herself unavailable; scurried away when she saw her in the halls and even after she demanded of the front office staff that she be granted an audience, Chapman nor the staff made the slightest attempt to do so.

S.R. sent an urgent email in August of 2017 asking to speak with Waite. Upon receiving the email Waite responded to Chapman, "is this the [L.C.] situation girl," to which Chapman responded, "yes I believe so." Both had apparently totally forgotten the entire cascade of events. Nothing appears in emails or from testimony of Chapman or Waite of the slightest interest in predictable retaliation or remedying the grievances. Chapman commented

she later learned Waite had met with S.R. who informed S.R. that "she could enroll [P.R.] right now if she wanted to." Chapman claimed her elucidation came from the school secretaries. There is no written note or record of any such offers. S.R. will testify that the meeting lasted for less than five minutes and Waite was dismissive with the comment that "I can do nothing for you".

The charade that P.R. was 'homeschooled" is mystifying; A "homebound student" has support from a school staff member. None was mentioned.

In her deposition Chapman testified that at some point in August of 2017 she learning that P.R. would be "homeschooled". However records indicate that as o September 11, 2017, Shoshone High School sent P.R.'s records to Gooding High School. Chapman made no follow up inquiry.

Chapman testified that had P.R. returned to the high school she would have set up a meeting and implemented a safety plan, but because she was informed P.R. would be homeschooled, that meeting never needed to occur.

As for L.C.'s return to high school in the fall of 2017 Chapman testified that she recalled a meeting in August with L.C. when she informed him of supervision at school while attending classes. Nothing was communicated to any teacher she did not recall whether she informed L.C.'s teachers that he could not be in an unsupervised class. There is no written documentation of this arrangement and no evidence that restrictions were ever implemented.

## LEGAL FRAMEWORK

This case involves the application of legal standards governing claims pursuant to Title IX. As outlined by this court:

The United States Supreme Court established four requirements for the imposition of school district liability under Title IX for peer harassment. First, the school must exercise "substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. Second, the sexual harassment must be "so severe, pervasive, and objectively offensive, that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650. Third, the school must have had "actual knowledge" of the harassment. *Id.* And fourth, the school district is liable only if "its deliberate indifference subjects its students to harassment. That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 644-45. (internal quotation marks and citations omitted)

The school district clearly had substantial control over both the harasser and the context in which the harassment occurred. As the sexual assault resulted in criminal charges against L.C., this assault clearly met the standard of several, pervasive, and objectionably offensive. The school officials did not have actual knowledge of any concerns prior to discovering evidence of the assault. Plaintiff is not alleging any deliberate indifference to the situation prior to discover of the assault.

As further outlined by this court, in Davis, the United States Supreme Court explained that "deliberate indifference" occurs "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. The Supreme Court made it clear that school districts are not required to "purge" their schools of "actionable peer harassment" or engage in "particular disciplinary action." Id. at 648-49.

As further noted by this court:

Deliberate indifference requires "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." D.A. v. Meridian Joint Sch. Dist. No. 2, 289 F.R.D. 614, 622–23 (D. Idaho 2013) (quoting Duvall v. County of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001)). The public entity's failure to act must be a result of more than mere negligence; rather, it must involve a measure of deliberateness.

Duvall, 260 F.3d at 1139. But "deliberate indifference" is also "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). "Deliberate indifference will often be a fact- laden question," for which bright lines are ill suited. Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 457 n. 12 (5th Cir. 1994); see also Doe A. v. Green, 298 F. Supp. 2d 1025, 1036 n. 4 (D. Nev. 2004) (stating that no bright line rule in Ninth Circuit cases defines "deliberate indifference," and finding the same from a review outside the circuit). Liability is imposed upon a federal funding recipient's deliberate indifference, because "the deliberate indifference constitute[s] intentional discrimination on the basis of sex." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 182 (2005).

### Determination of Deliberate Indifference

A determination of whether the actions of the Shoshone School District school officials met the standard of deliberate indifference will necessarily require an analysis of their actions subsequent to the discovery of the sexual assault. Plaintiff does not claim that the school officials should have been aware of and stopped the serious sexual assault. Rather, the claims are based on the actions and inactions of the school officials following their knowledge of the serious sexual assault that acted to denied her access to the educational opportunities or benefits provided by the school, which Title IX is designed to protect. As succinctly stated in Zeno v. Pine Plains, 702 F.3d 655 (2nd Cir. 2012):

> Deliberate indifference means that the defendant's response or lack of response to the alleged harassment was clearly unreasonable in light of the known circumstances. Deliberate indifference may be found where a defendant takes remedial action only after a lengthy and unjustifiable delay or where defendant's response was so inadequate or ineffective that discriminatory intent may be inferred. In other words, deliberate indifference requires a finding that the District's actions or inactions in response to known harassment effectively caused further harassment to occur.

Plaintiff will present evidence that the jurors can consider, along with other evidence, in their determination of whether the actions of the defendants were deliberately indifferent. The evidence plaintiff will submit will include district policies, state statutes governing school

districts in Idaho, and the regulations and guidance issued by the U.S. Department of Education's Office for Civil Rights related to how school districts are required to respond to sexual harassment claims under Title IX.

In the case of *Jane Does 1–10 v. Baylor Univerisity* 240 F.Supp.3d 646, 659-660 (W.D. Tex. March 7, 2017), the court noted that while failure to comply with guidelines from the OCR cannot alone demonstrate deliberate indifference, they are one consideration that may be consulted when assessing the appropriateness of a school's response. The court stated as follows:

> "Second, Baylor argues that non-compliance with regulatory and administrative guidance from the Department of Education ("DOE")— which Plaintiffs reference in their Complaint— cannot serve as the basis for establishing deliberate indifference. While the Court agrees that a school's failure to comply with certain DOE guidelines generally cannot, alone, demonstrate a school's deliberate indifference, see Gebser, 524 U.S. at 291–92, it also agrees with numerous courts that DOE regulations may still be consulted when assessing the appropriateness of a school's response to reports of sexual assault. See, e.g., Butters v. James Madison Univ., — F. Supp. 3d —-, 2016 WL 5317695, at *11 (W.D. Va. Sept. 22, 2016) ("[A] school's compliance . . . with the [Dear Colleague Letter] can be a factor that the court considers"); Doe v. Forest Hills Sch. Dist., No. 1:13-CV-428, 2015 WL 9906260, at *10 (W.D. Mich. Mar. 31, 2015) (" Although failure to comply with Title IX guidance does not, on its own, constitute deliberate indifference, it is one consideration")."

Plaintiff's position in the introduction of these policies, statutes, regulations, and guidance is that, while failure to comply with these cannot alone establish deliberate indifference, these policies, state statutes, and federal regulations and guidance, along with other evidence, can be considered in an assessment of whether the actions or inactions of the defendants were deliberately indifferent.

Plaintiff is not presenting this evidence in the context of a claim under 42 U.S. C 1983, as this claim was dismissed. Rather this evidence will be introduced to provide a basis for the jury to determine whether the defendant's response or lack of response to the alleged harassment was clearly unreasonable in light of the known circumstances. The known circumstances include the directives to school officials regarding the actions they are required to take prior to excluding a student from attending school for over a month, the services that are required if they are establishing a situation where a student is receiving homebound instruction, and how they are supposed to respond in situations of known sexual harassment or assault.

Many cases brought under Title IX involve situations where the school officials had knowledge of circumstances of the potential for sexual harassment and the deliberate indifference to the situation. See for example, Doe A. v. Green, 298 F. Supp. 2d 1025, 1036 n. 4 (D. Nev. 2004), which was cited in the Court's decision on the Motion for Summary Judgment. This case is different because the focus is on how the district's response to discovery of sexual assault was deliberately indifferent, and as a result, denied plaintiff her right to receive an education.

As also noted by this court, "Deliberate indifference will often be a fact laden question," for which bright lines are ill suited. Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 457 n. 12 (5th Cir. 1994), which stated that stating that "no bright line rule in Ninth Circuit cases defines "deliberate indifference," Among the "facts" that must be considered are the policies, statutes, regulations, and guidance which govern the actions of school officials.

It is also clearly recognized that school districts are not required to "purge" their schools of "actionable peer harassment" or engage in "particular disciplinary action." Davis at

648-49. Thus, the evidence of the policies, statutes, regulations, and guidance will be introduced, along with other evidence, to allow the jury to be informed of all relevant facts, which are a component of the known circumstances in the context of allowing them to determine whether the actions or inactions of the defendants constituted deliberate indifference.

Ample guidance is provided to school districts especially to Title IX coordinators, on their responsibilities in situations of suspected sexual assault that may have created a hostile environment and how school officials are required to respond to a finding of a hostile environment. In 2015, The U.S. Department of Education's Office for Civil Rights (DOE) issued Title IX Resource Guide, which on its site it described as "a useful tool for schools and their Title IX coordinators to understand schools' obligations under Title IX." Section 4 of this document addresses Sex-Based Harassment pp 15, 16 and 17 (Attached Hereto) This document states:

> "Title IX prohibits sex-based harassment by peers, employees, or third parties that is sufficiently serious to deny or limit a student's ability to participate in or benefit from the recipient's education programs and activities (*i.e.*, creates a hostile environment). When a recipient knows or reasonably should know of possible sex- based harassment, it must take immediate and appropriate steps to investigate or therwise determine what occurred. If an investigation reveals that the harassment created a hostile environment, the recipient must take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent the harassment from recurring, and, as appropriate, remedy its effects."

While failure to comply with these regulations and guidance alone cannot serve as the basis for establishing deliberate indifference, this DOE guidance provides an excellent basis for the jurors, along with other evidence, to consider whether the actions and inactions of the defendants should be considered to have been deliberately indifferent.

Plaintiff requests Judicial Notice of key Title IX regulations and guidance provided to schools by DOE. Specific portions of these regulations and guidance provide the basis for Jury Instructions in this case; the language has been simplified for the benefit of the jurors.

The extensive document *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001), has been excerpted as an exhibit to set forth pages 15, 16 and 17, which contain the specific provisions related to the school's response to sexual harassment.

In 2015, The U.S. Department of Education's Office for Civil Rights issued *Title IX Resource Guide*, which on its site it described as "a useful tool for schools and their Title IX coordinators to understand schools' obligations under Title IX." This document has likewise been excerpted to set forth only the pages that relate to the school response to sexual harassment. Section 4 of this document also provides links to other relevant OCR documents. One of these documents, *Dear Colleague Letter: Harassment and Bullying* (October 26, 2010), provided a more extensive description of the requirements of the school in situations of harassment. These are set forth for the Court's consideration related to the critical importance of this guidance. In addition, note that in the regulations themselves, ample flexibility is provided to school officials in making determinations, based on the facts presented, for how they should respond. It is for this reason that these regulations and guidance documents are provided as "one consideration." Pages 2-3 (footnote omitted)

> When responding to harassment, a school must take immediate and appropriate action to investigate or otherwise determine what occurred. The specific steps in a school's investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. In all cases, however, the inquiry should be prompt, thorough, and impartial.

If an investigation reveals that discriminatory harassment has occurred, a school must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring. These duties are a school's responsibility even if the misconduct also is covered by an anti-bullying policy, and regardless of whether a student has complained, asked the school to take action, or identified the harassment as a form of discrimination.

Appropriate steps to end harassment may include separating the accused harasser and the target, providing counseling for the target and/or harasser, or taking disciplinary action against the harasser. These steps should not penalize the student who was harassed. For example, any separation of the target from an alleged harasser should be designed to minimize the burden on the target's educational program (e.g., not requiring the target to change his or her class schedule).

In addition, depending on the extent of the harassment, the school may need to provide training or other interventions not only for the perpetrators, but also for the larger school community, to ensure that all students, their families, and school staff can recognize harassment if it recurs and know how to respond. A school also may be required to provide additional services to the student who was harassed in order to address the effects of the harassment, particularly if the school initially delays in responding or responds inappropriately or inadequately to information about harassment. An effective response also may need to include the issuance of new policies against harassment and new procedures by which students, parents, and employees may report allegations of harassment (or wide dissemination of existing policies and procedures), as well as wide distribution of the contact information for the district's Title IX and Section 504/Title II coordinators.

Finally, a school should take steps to stop further harassment and prevent any retaliation against the person who made the complaint (or was the subject of the harassment) or against those who provided information as witnesses. At a minimum, the school's responsibilities include making sure that the harassed students and their families know how to report any subsequent problems, conducting follow-up inquiries to see if there have been any new incidents or any instances of retaliation, and responding promptly and appropriately to address continuing or new problems.

### Compensatory Damages

Plaintiff's request for compensatory damages includes damages associated with the mental and emotional suffering plaintiff experienced and can be reasonably expected to experience in the future, the reasonable value of the mental health care and treatment needed by

the plaintiff and reasonably certain to be needed in the future: the losses associated with the denial of educational opportunities and benefits sustained by plaintiff or likely to be sustained by her in the future, and the losses or potential losses associated with the damage to her reputation.

In the case of *Zeno v. Pine Plains CSD* 702 F.3d 655 (2nd Cir. 2012), the jury found the District liable for violating Title VI of the Civil Rights Act of 1964 ("Title VI") and awarded Anthony $1.25 million in damages, which the court reduced to $1 million. The defendants objected to the reduced $1 million award on three grounds, arguing that the plaintiff failed to present sufficient evidence to sustain the $1 million award, established only "garden variety" damages, and far exceed those in other cases of student-on-student harassment.

The court's response provides helpful insight into the appropriateness of such compensatory damages:

> First, we conclude that the record contained sufficient evidence to uphold the jury's award. Evidence presented at trial, including the testimony of Anthony, his mother, and Maxey (of the N.A.A.C.P.), revealed Anthony's increasing frustration, loneliness, and other emotional anguish. While Anthony's testimony alone arguably might not support his claim of emotional distress, see, e.g., *Annis v. Cnty. of Westchester*, 136 F.3d 239, 249 (2d Cir.1998) ("[T]he only evidence of [the victim's] emotional distress—her own testimony—is insufficient to warrant an award of compensatory damages for that injury."), others who testified corroborated Anthony's suffering and distress, see, e.g., *Patrolmen's Benevolent Assn., of the City of N.Y. v. City of N.Y.*, 310 F.3d 43, 56 (2d Cir.2002) (damages for emotional distress warranted if plaintiff's testimony is corroborated by other evidence). In addition, evidence of medical attention is not required to establish damages for emotional distress. See *Miner v. City of Glens Falls*, 999 F.2d 655, 663 (2d Cir.1993).

> Moreover, Anthony demonstrated that he suffered "substantially adverse educational consequences" as a result of the District's deliberate indifference. Appellee Br. at 69. Anthony's prolonged harassment resulted in an educational environment that was disparately hostile, depriving him of a scholastic benefit. *Hayut, 352 F.3d at 750*. Anthony also accepted the IEP diploma rather than attempt to satisfy the Regents requirements. As a consequence, the jury reasonably could have found that his ability to attend college or enter the workforce was significantly and adversely impaired.

Second, as to the District's argument that Anthony has proved no more than the "garden variety" damages of the type found in employment discrimination cases, the fact is that this is not an employment discrimination case, nor are the damages of the "garden variety" type. Anthony was not an adult losing sleep due to workplace stress. Rather, he was a teenager being subjected—at a vulnerable point in his life—to three-and-a-half years of racist, demeaning, threatening, and violent conduct. Furthermore, the conduct occurred at his school, in the presence of friends, classmates, other students, and teachers. The jury reasonably could have found that the harassment would have a profound and long-term impact on Anthony's life and his ability to earn a living.

Third, as to the District's contention that the $1 million award far exceeds other awards and "shock[s] the judicial conscience," *Manganiello*, 612 F.3d at 168, we are not persuaded. Indeed, the district court's award as reduced was "located within the range of permissible decisions." Id. at 165 (internal quotation omitted). A review of cases in the educational context indicate that verdicts range from the low six figures, to the mid-six figures, to as much as $1 million.17 Given the severity, duration, and egregiousness of Anthony's unchecked harassment, his reduced compensatory damages award was not outside the "range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir.2008) (internal quotation omitted); *Ismail*, 899 F.2d at 187 (appellate review focuses on whether the verdict lies "within [the] reasonable range"). Because of the limited nature of our review and the fact-intensive nature of this case, see *Gasperini v. Ctr. for Humanities, Inc.*, 149 F.3d 137, 141 (2d Cir.1998) ("Deference is justified because the district judge is closer to the evidence, and is therefore in a better position to determine whether a particular award is excessive given the facts of the case."), we decline to upset the district court's decision.

Given the ongoing and objective offensiveness of the student-on-student harassment here, we hold that the district court did not abuse its discretion in determining that the record could support an award to Anthony of $1 million. See *In re Sims*, 534 F.3d at 132.

Applying these standards to the situation in the present case, plaintiff is asking for compensatory damages associated with the following losses:

1.    The mental and emotional suffering Pauline experienced and could be reasonably expected to experience in the future, including the anguish, insult, distress, invasion of privacy, grief, embarrassment, humiliation, indignity, loss of enjoyment of life, anxiety, and depression;

2.   The reasonable value of the mental health care and treatment needed by and provided to the Pauline and reasonably certain to be needed and provided in the future;

3.   The losses associated with the denial of educational opportunities and benefits sustained by Pauline or likely to be sustained by her in the future.

4.   The losses or potential losses associated with the damage to her reputation suffered by Pauline and the prospective limitations on her future educational, professional, or community activities due to this damage to her reputation or based on her reasonable anticipation of fear of the reactions of others due to the damage to her reputation.

## REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rule of Evidence 201(b), Plaintiffs respectfully request that the Court take judicial notice of the following documents that have been released by the U.S. Department of Education's Office for Civil Rights (OCR) that provides this guidance to school officials and Title IX coordinators. OCR enforces, among other statutes, Title IX of the Education Amendments of 1972. The documents include:

1.   *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (January, 2001).

2.   *"Dear Colleague Letter"* (January 25, 2006) from Assistant Secretary for Civil Rights Stephanie Monroe, reminding recipients of the standards applicable to OCR's enforcement of compliance in cases raising sexual harassment issues.

3.   *"Dear Colleague Letter"* (October 26, 2010) from Assistant Secretary for Civil Rights, Russlynn Ali, concerning recipients' obligations to protect students

Case 1:17-cv-00521-CWD   Document 68   Filed 03/26/19   Page 23 of 29

from student-on-student harassment on the basis of sex; race, color and national origin; and disability. The letter clarifies the relationship between bullying and discriminatory harassment, provides examples of harassment, and illustrates how a school should respond in each case.

4.   *"Dear Colleague Letter"* (April 24, 2015) from Assistant Secretary for Civil Rights Catherine E. Lhamon to school districts, colleges, and universities reminding them of their obligation to designate a Title IX coordinator. The Dear Colleague Letter is accompanied by a *Letter to Title IX Coordinators* that provides them with more information about their role and a *Title IX Resource Guide* that includes an overview of Title IX's requirements with respect to several key issues.

Plaintiff also requests the court as per F.R.C.P 201 to take judicial notice of Idaho statutes and regulations of the Idaho Department of Education:

1.   TITLE 33 EDUCATION CHAPTER 2 ATTENDANCE AT SCHOOLS 33-205. DENIAL OF SCHOOL ATTENDANCE.

2.   TITLE 33 EDUCATION CHAPTER 5 DISTRICT TRUSTEES 33-512(1). GOVERNANCE OF SCHOOLS.

3.   TITLE 33 EDUCATION CHAPTER 10 FOUNDATION PROGRAM — STATE AID — APPORTIONMENT 33-1003A. CALCULATION OF AVERAGE DAILY ATTENDANCE.

4.   Idaho Rules Governing Administration 250. PUPIL ACCOUNTING AND REQUIRED INSTRUCTIONAL TIME. 05. Day of Attendance (ADA) - Grades One Through Twelve (1- 12).

Copies are included in the Plaintiff's exhibits.

Federal Rule of Evidence 201(b) provides that this Court may take judicial notice of

facts that are "not subject to reasonable dispute" because they are either "generally known within the trial court's territorial jurisdiction" or "can accurately and readily [be] determined from sources whose accuracy cannot reasonably be questioned."

The documents from DOE and Idaho code and regulations are properly the subject of judicial notice. They are published on government websites and not subject to reasonable dispute.

**VIDEO TAPE EVIDENCE TO BE SUBMITTED TO THE COURT**

The defendants furnished to Plaintiff's counsel, at the initiation of this case, a lengthy videotape taken by the surveillance camera of the sexual acts that took place in the high school computer laboratory. Plaintiff counsel recently carefully reviewed those videotapes to quite frankly confirm that Defendants were not misleading counsel or the court in stating that the sexual acts were consensual if not frankly loving in nature. The defendants argued that the sex was intimate, and certainly not to be considered to be a rape; the court made a note in the summary judgment decision remarking that it was plaintiff who used the rape nomenclature, very vigorously disputed by the defendants.

It is therefore rather astounding to discover on the videotape scenes of the student on student encounters, which were chilling and horrifying. L.C. can clearly be seen grabbing P.R. by the hair and both forcing and guiding her on oral and anal sex as well as viciously bending her backward by the neck over a chair, pining her head back so far that her head and face are draped over the back of the chair with his arm across her neck. P.R. had so testified in her deposition but her credibility was being questioned by defendant's counsel questions directly implying that they implying she was aware that no forced conduct occurred.

The video tapes are relevant to several key issues, including extensive damages in that she had these scenes dancing in her brain while banished from the school and staying alone in the family home for weeks on end; she considered her school exclusion was punishment; that the entire episode was "her fault"; inevitably leading to a well-founded belief that both teachers and parents would consider her a slut or horror who readily consented to all of the sex acts and imperiled the future of the schools soccer star, L.C.. Her therapy for one and a half years has been required by her Post Traumatic Stress Disorder diagnosed and treated by Andrea Madson.

Her post-traumatic syndrome and other physiological mental illness will be described in detail by her trauma specialist Madson.  Madson is employed by A-1 Solutions with offices throughout the magic valley. The defense took her deposition and of course have all of the treating providers health records. Implied by defense counsel, both in argument and in the deposition of Louis was that the sex was entirely consensual and therefore L.C. presented little or no danger to the remainder of the student body which explains why he was given the suspension of a few days from the school and allowed to return to take his core classes and ultimately graduate from high school. In essence, Luis is portrayed as a participant in normal adolescent social and sexual conduct.

If the jury was to believe that P.R. was sexually aggressive, even though only 13 years of age, her character and credibility are seriously damaged. For these reasons, the video clips of certain sexual scenes should be displayed to the jury. The pertinent ones are approximately 10 minutes in length and will be displayed by Mr. John Glenn Hall using the courtroom technology system. The clips being requested to be allowed as evidence will be provided to the court under seal at the pretrial conference so that the court and counsel know their contents beforehand. It is well-established law that video taped evidence is readily received in federal courts when it is

relevant, material and not misleading. Furthermore, the school district cannot now complain that it is highly prejudicial since they assert in depositions, briefs and arguments to the court that issues of character and consent were so overriding in this case that indeed the lawsuit should never have been filed.

L.C. testified in deposition, that P.R. had sexual encounters with other soccer players, painting her as promiscuous and himself an innocent teenager whose "hormones" drove him to a simple mistake. It is beyond question that welcomed sexual advances and past sexual activity has no bearing upon the emotional trauma from sexual acts and conduct that is unwelcome and forced.   In this case, the sexual violence and principal Chapman's reaction to it (Chapman watched the video) considering it "intimate" was devastating to her mental and physical well-being established by the medial records and her therapist's testimony. On point is *Turong v. Smith,* 183 Fed. 273-275 (D. Colo. 1998), (by in evidence, the plaintiff's prior sexual activity with third parties has no bearing on the issue of whether she consented to sexual violence).

The evidential status of the videotape has been addressed in the Motion in Limine, eliminating any assertions by defense counsel of surprise that it would be offered at all. It may be that defense counsel did not in fact watch the videotapes, and is simply accepted the version of those events as described by Chapman, Waite, and L.C.

Noteworthy is the abusive contact of L.C. and the mystifying decisions by Chapman and Waite, to treat L.C. favorably; attend and finish high school only attending half days and taking courses online; taking courses from Mr. Waite off campus, etc.  Another motive came to light; that the status of L.C.'s father as the soccer coach of the championship team might be imperiled if L.C. was expelled and/or suspended from the high school, which without question should have occurred (the father continues to coach to this day). Additional motive for hiding the coaching

status of the father comes into focus when the scenes in the video tapes are compared to the testimony of L.C., Chapman and Waite that there was a romantic, intimate relationship and the terrible truth that finally came out in L.C.'s second deposition and the videotapes were viewed.

## JURY INSTRUCTIONS AND VERDICT FORM

The Ninth Circuit Model Jury Instructions, with additional instructions that specifically address the Title IX claims in accordance with case law and the DOE/ OCR regulations are provided. Copies are attached for ease of reference in situ, and of course in the instruction packet.

A Verdict Form is separately provided. In a Title IX case the form interrogates the following issues: whether plaintiff was subjected to harassment based on sex; whether the harassment was severe, pervasive, and objectively offensive; whether defendant had control over the harasser and the environment in which the harassment occurred; and whether defendant had actual knowledge. None of these issues are in dispute. The instruction is more extensive than as stated here but does contain key questions on the following:

The Verdict Form asks that after your deliberation, you in writing answer these questions:

1.   Did you find that defendant Shoshone School District acted with deliberate indifference after it became known to them that plaintiff P.R. had been sexually assaulted by another student while at school?

    Yes ___ No ___

If you answered "yes," continue on to Question 2. If you answered "no," your deliberations are complete. Have your [presiding juror] [foreperson] sign and date the verdict form.

2.   Did you find that as a result of the school district's actions, plaintiff P.R. was deprived of access to equal educational benefits or opportunities provided by defendant Shoshone School District?

Yes _____   No _____

If you answered "yes," continue on to Question 3.  If you answered "no," your deliberations are complete. Have your [presiding juror] [foreperson] sign and date the verdict form.

3.   What amount do you award plaintiff P.R. as damages?

$ _____ _____

Jury Foreman _____ Dated _____ of April 2019.

<u>SUBMISSION OF TRIAL BRIEF AND VERDICT FORM</u>

DATED this **25** day of **March**, 2019.

SCHLENDER LAW OFFICES

PLAINTIFF S.R.'S TRIAL BRIEF – Page 28

## CERTIFICATE OF SERVICE

I certify that on **25** day of **MARCH**, 2019, I caused a true and correct copy of this Plaintiff S.R.'s Trial Brief to be served as indicated below:

James G. Reid
Jennifer Reid Mahoney, PLLC
1211 W. Myrtle Street, Suite 350
Boise, Idaho 83702

BY: _____
E. Lee Schlender,
Attorney for Plaintiff

PLAINTIFF S.R.'S TRIAL BRIEF – Page 29